Williams, J.
 

 It is contended by the plaintiff that the Court of Common Pleas committed prejudicial error in reversing the judgment of the Municipal Court and entering final judgment for defendants, John Hummel and Elizabeth Hummel.
 

 There is considerable conflict in the evidence adduced but in determining the question presented it is only necessary to consider the evidence favorable to the plaintiff, Peter Hummel, Sr., and tending to support the allegations' of the amended bill of particulars upon which the cause was tried in the Municipal Court. The plaintiff fully pleaded all the facts relating to the various transactions shown by the evidence. The judge in that court, who tried the cause without the intervention of a jury, made no separate finding.of facts but only a general finding for the plaintiff; on this finding judgment was entered. The presumption is that the trial court did not err and it may therefore be assumed that the trial judge found all the issues' of fact in favor of the plaintiff. If the facts favorable to him warranted a judgment in his favor, then the Court of Common Pleas erred to his prejudice in entering final judgment for defendants. Therefore, this court will consider the evidence favorable' to plaintiff to be true for the purpose of determining the question as to whether judgment should have been entered against him as a matter of law.
 

 
 *522
 
 The evidence favorable to plaintiff and tending to prove the allegations of the amended bill of particulars may be summarized thus':
 

 On December 28, 1914, The Metropolitan Life Insurance Company issued a non-participating, fifteen-year endowment policy in the sum of $1,000 on the life of the defendant, John Hummel, plaintiff’s son, then twenty-three years of age, in which Elizabeth Hummel, wife of Peter Hummel, Sr., and the mother of John Hummel, was named beneficiary. It should be observed that the mother of John Hummel bears the same name as his wife, who is joined as defendant. The policy had no cash surrender value until the end of the third year.
 

 At the time the policy of insurance was taken out there was an oral agreement between the plaintiff and the defendant, John Hummel, that plaintiff and his wife Elizabeth, should “pay the premiums and get the money” on the policy. The policy remained in the possession of Peter Hummel and his wife until it matured and the semi-annual premiums of $30.16 each, amounting in all to $904.80, were paid by them.
 

 In 1918, a loan was made on the policy from the contracting insurance company and the proceeds of the loan were received by Elizabeth Hummel, the beneficiary, through a check made payable to and endorsed by both the beneficiary and the insured. When the policy matured on December 28, 1929, the company issued a check for the proceeds thereof amounting to $938.04, payable to the order of John Hummel, and delivered it to Peter Hummel, Sr., or to him and his wife.
 

 About one week, thereafter the plaintiff delivered the check to his son, John Hummel, with the understanding or agreement between them that the son would deposit it in the bank in his father’s name. A few days later the father gave the son an additional sum of $62 with the further understanding that the money would be placed on deposit with the proceeds
 
 *523
 
 of the policy so that the total amount in the hank to the credit of the father would be $1,000. (The extra four cents appear to have been disregarded.) On direct examination the defendant, Elizabeth Hummel, after referring to the check and the date of its receipt, testified: “The next day.we took it down and put in the bank.” On cross-examination she further testified: “Q. And the check was put in the building association in you [your] and your husband’s name? A. He put it in his name and later in my name. Q. Is it a joint survivor account? A. Yes.” Some time after the check was turned over to the son, the father went to the son’s home. Regarding this visit the father testified through an interpreter: “He [plaintiff] asked her [meaning the son’s wife] for his bank book and she went to the safe or cupboard and said ‘Here it is’ and held it in front of her and said ‘Here’s your book.’ ” However, the father saw the book at a distance only and did not learn what was' written in it. On or about the thirtieth of May, 1930, the son paid the father $19 interest; but no interest was paid thereafter.
 

 The plaintiff and his wife, Elizabeth Hummel, were divorced in February, 1930, and on division of the property the right to the proceeds of the policy was given or transferred to him by her. In fact she testified in the case that the proceeds belonged to him.
 

 The foregoing constitutes all the evidence favorable to the plaintiff.
 

 Peter Hummel, Sr., due to the transfer and assignment from his wife, was enabled to maintain the action as to all the monies in his own name.
 

 Was the oral contract between the father and mother on the one hand and the son on the other, one that could not be performed within a year of the making thereof within the meaning of the Statute of Frauds, Section 8621, General Code? If it was not capable of being performed within that period it was
 
 *524
 
 unenforceable.
 
 Heaton
 
 v.
 
 Eldridge & Higgins,
 
 56 Ohio St., 87, 46 N. E., 638, 6 Am. St. Rep., 737, 36 L. R. A., 817.
 

 The contract of insurance embodied in the policy was capable of being performed within one year for the reason that if the insured died while the policy was in force the proceeds would be payable forthwith ■to the beneficiary; but the oral contract which was wholly distinct and separate stands on a different footing. The latter was a bilateral contract, that is, it was characterized by mutual promises; in effect, it consisted of a promise on the, part of the parents to pay the premiums on the policy, in consideration of a promise of the insured to pay over the proceeds of the policy when received by him. Since the policy had no cash surrender value until the end of the third year, the insured could not. in any event receive the proceeds of the policy until the expiration of that period. There is always the chance that a party to a contract may die within a year; yet some contracts continue to subsist Notwithstanding the demise of a party, and others do not. The personal existence of the insured was material to the oral contract. 2 Page on Contracts, 2254, Section 1305. On his death the contract would terminate ; in that event, it would be impossible to further perform on either side, and discharge from all obligations thereunder would necessarily follow. While death would excuse further payment of premiums by the parents, the payments of premiums up to the happening of that event could not be considered equivalent to full performance on their part. In the last analysis the parents could fully perform only by doing those things which would make the reciprocal promise of the son performable and obligatory. The son could not fulfill his promise until he received the proceeds of the policy, and his death would give the proceeds to the beneficiary. Therefore the death of the son within the year could not result in a full performance on the part
 
 *525
 
 of the parents. On the other hand the death would prevent full performance and so the contract is within the statute.
 
 Edwards & Sons
 
 v.
 
 Farve,
 
 110 Miss., 864, 870, 71 So., 12.
 

 The conclusion is inevitable that the oral contract was unenforceable because it was not capable of being performed within a year and that no action can be maintained thereon.
 

 Since the amended bill of particulars pleaded all the facts' very fully, the further question is presented whether there arose a quasi-contractual relation between the parents and the son upon which could be predicated an action in the nature of assumpsit for money had and received.
 

 In order to proceed logically it is necessary to have in mind the various' phases of contractual obligations.
 

 There are three classes of simple contracts; express, implied in fact, and implied in law. Keener on Quasi Contracts (1893), 3. In express contracts the assent
 
 to
 
 its terms is actually expressed in offer and acceptance. In contracts implied in fact the meeting of the minds, manifested in express contracts by offer and acceptance, is shown by the surrounding circumstances which make it inferable that the contract exists as a matter of tacit understanding. In contracts implied in law there is no meeting of the minds, but civil liability arises out of the obligation cast by law upon a person m receipt of benefits which he is not justly entitled to retain and for which he may be made to respond to another in an action in the nature of assumpsit. Contracts implied in law are not’ true contracts; the relation springing therefrom is not in a strict sense contractual, but quasi-contractual or constructively. contractual. In truth contracts implied in law are often called quasi contracts or constructive contracts'.
 
 Columbus, Hocking Valley & Toledo Ry. Co.
 
 v.
 
 Gaffney,
 
 65 Ohio St., 104, 61 N. E., 152.
 

 The doctrine of liability on a quasi contract was
 
 *526
 
 recognized early in common-law jurisprudence. It has been said that “the belief is general in this country that Lord Mansfield
 
 made
 
 the law of quasi contracts, that until his time the action, due to fragmentary development, was limited in scope. ’ ’ 45 Harvard Law Review, 1333; see also Woodward on The Law of Quasi Contracts, 2, Section 2.
 

 The pronouncement of that jurist on the subject is found in
 
 Moses
 
 v.
 
 Mac ferian,
 
 2 Burr., 1005, from which we quote this significant language: ‘ ‘ This kind of equitable action, to recover back money, which ought not in justice to be kept, is
 
 very beneficial,
 
 and therefore
 
 much encouraged.
 
 It lies
 
 only
 
 for money which,
 
 ex aequo et bono,
 
 the defendant
 
 ought
 
 to refund: It does
 
 not lie
 
 for money paid by the plaintiff, which is claimed of him as
 
 payable in point of honour and honesty, * * *.
 

 “In one word, the gist of this' kind of action is, that the defendant, upon the circumstances of the case, is
 
 obliged by the ties of natural justice and equity
 
 to
 
 refund
 
 the money.”
 

 It will be observed that in this quotation the action is referred to as equitable. It must be conceded that a suit for money had and received based on a quasi contract, is, in some sense, an equitable action
 
 (Western Assurance Co.
 
 v.
 
 Towle,
 
 65 Wis., 247, 26 N. W., 104); but it seems to be equitable only to the degree that it is based on a moral obligation to make restitution which rests upon a person who has received a benefit which if retained by him, would result in inequity and injustice. Woodward on Quasi Contracts' (1912), Section 6. The moral obligation thus becomes the basis for a legal obligation giving rise to an action on the common counts.
 
 Wellstson Coal Co.
 
 v.
 
 Franklin Paper Co.,
 
 57 Ohio St., 182, 188, 48 N. E., 888.
 

 Blackstone recognized the distinction between obligations
 
 ex contractu
 
 and
 
 quasi ex contractu.
 
 Blackstone Commentaries, Book IT, 443; and the learned
 
 *527
 
 author also recognized the obligation
 
 quasi ex contractu
 
 to be a legal one affording a remedy by assumpsit in this language: “A third species of implied
 
 assumpsits
 
 is when one has had and received money belonging to another, without any valuable consideration given on the receiver’s part; for the law con-' strues this to be money had and received for the use of the owner only; and implies that the person so receiving promised, and undertook, to account for it to the true proprietor. And, if he unjustly detains it, an action on the case lies against him for the breach of such implied promise and undertaking; and he will be made to repay the owner in damages, equivalent to what he has detained in violation of such his promise. This is a very extensive and beneficial remedy, applicable to almost every case where the defendant has received money which
 
 ex aequo et bono
 
 he ought to refund. It lies for money paid by mistake, or on a consideration which happens to fail, or through imposition, extortion, or oppression, or where any undue advantage is taken of the plaintiff’s situation.” Blackstone Commentaries, Book III, 163. In support of the proposition
 
 Moses
 
 v.
 
 Macferlan, supra,
 
 is cited.
 

 A careful reading of the books will show that
 
 Moses
 
 v.
 
 Macferlan, supra,
 
 has been frequently criticised, but it remains the leading case on that phase of the law of quasi contracts that is predicated upon the doctrine of unjust enrichment.
 

 Ames, in his instructive monograph on assumpsit in 2 Harvard Law Review, 64, states: “Quasi contracts are founded (1) upon a record, (2) upon a statutory, official, or customary duty, or (3) upon the fundamental principle of justice that no one ought unjustly to enrich himself at the expense of another.” See also Woodward on The Law of Quasi Contracts, pages 1 and 2. Of course this court is not concerned with the first two of the classes enumerated.
 

 Keener, in his work on Quasi Contracts (.1893), 19,
 
 *528
 
 says: “By far the most important and most numerous illustrations of the scope of quasi contracts are found in those cases where the plaintiff’s right to recover rests upon the doctrine that a man shall not be allowed to enrich himself unjustly at the expense of another.”
 

 The term “unjust enrichment” has been criticised as unsatisfactory in that “it connotes an actual increase of the defendant’s estate.” Woodward on Quasi Contracts, 9, Section 8. The criticism, it seems, arises out of the fact that there is a class of cases in which right of recovery on quasi contracts depends upon enhancement of the value of defendant’s property; but it is not necessary now to explore that field. In the instant case we are concerned only with money received by defendant, and right of recovery therefor “depends upon the consideration whether the defendant is thereby enriched at the loss and expense of the plaintiff; * *
 
 Wellston Coal Co.
 
 v.
 
 Franklin Paper Co., supra.
 
 In our judgment unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another.
 

 Even though a contract is unenforceable under the Statute of Frauds because it is not in writing, a plaintiff who has fully performed his part of the contract may maintain an action for money had and received against the other contracting party who is the recipient of a benefit to his unjust enrichment, by the plaintiff’s performance, but refuses to perform himself; the basis of the liability is the quasi-contractual relation to which the law gives rise.
 
 Towsley
 
 v.
 
 Moore,
 
 30 Ohio St., 184; Keener on Quasi Contracts (1893), 277
 
 et seq.;
 
 Woodward on The Law of Quasi Contracts, 147, Section 95.
 

 This principle has been applied in suits brought by a party plaintiff who has fully performed a contract, unenforceable because it cannot be performed within a year, to recover for benefits received and unjustly withheld by the other party.
 
 Swift
 
 v.
 
 Swift,
 
 46 Cal.,
 
 *529
 
 266;
 
 Weber
 
 v.
 
 Weber,
 
 25 Ky. L., 908, 76 S. W., 507;
 
 Edwards & Sons
 
 v.
 
 Farve, supra; Bowman
 
 v.
 
 Wade,
 
 54 Ore., 347, 103 P., 72;
 
 Interstate Hotel Co.
 
 v.
 
 Woodward & Burgess Amusement Co.,
 
 103 Mo. App., 198, 77 S. W., 114;
 
 Wonsettler
 
 v.
 
 Lee,
 
 40 Kan., 367;
 
 Gadman
 
 v.
 
 Marble,
 
 76 Mich., 448, 43 N. W., 315, 5 L. R. A., 707;
 
 Montague
 
 v.
 
 Garnett,
 
 66 Ky., 297; Keener on Quasi Contracts 278; Woodward on The Law of Quasi Contracts, 147, Section 95.
 

 In the instant case the parents fully performed the oral contract by paying the premiums and as a result the son received the proceeds of the policy for which he gave nothing in return. He was morally obligated by his unenforceable oral contract to pay the money to his parents but refused to perform the obligation. He could resist an action brought on the unenforceable contract because it was not in writing*; yet the law does not allow him to retain the money to his unjust enrichment but recognizes a legal obligation,
 
 quasi ex contractu,
 
 enforceable in an action for money had and received.
 

 The reasons’ justifying a judgment against the defendant, John Hummel, have been pointed out at length. However, a joint judgment was rendered against both defendants and this course seems to have been warranted by the evidence favorable to the plaintiff. Such evidence shows the following factual situation : The defendant, Elizabeth Hummel, according to her own testimony was present when the check was delivered to her husband and when the transactions relating to payments' of $62 and $19 in interest took place although she says the latter amount was $20 and was not paid as interest. Her action with regards to the deposit of the money in the bank, in which she admits she had an interest, and with regards to the bank book, shows she was a party to the taking and retaining the proceeds' of the check of $938.04 and $62 paid later. On plaintiff’s theory of the case she
 
 *530
 
 was as much liable for money had and received as her husband, for they acted together in withholding the funds from the plaintiff.
 

 The trial judge, as trier of the facts, was justified in finding that the proceeds of the policy and the $62 were received by the son and his wife to the use of his father and that a quasi contract arose, upon which the father was entitled to recover judgment against both defendants.
 

 The judgments of the Court of Common Pleas and the Court of Appeals will be reversed and judgment of the Municipal Court affirmed.
 

 Judgment reversed.
 

 Weygandt, C. J., Matthias, Day, Zimmerman, Myers and Gorman, JJ., concur.